## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| CYNTHIA P. WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 3:11cv208-JAG |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

Cynthia P. Williams ("Plaintiff") has worked in numerous unskilled occupations since she left school in the eleventh grade until, in 2003, she stopped working — allegedly due to disability. She has twice applied for Social Security Disability ("DIB"), claiming several severe physical impairments, severe depression, and mild mental retardation. Her first claim was denied after a hearing before an Administrative Law Judge ("ALJ"), who found her "not disabled" as defined by the Social Security Act ("the Act") and applicable regulations. That decision was based in part on a finding that Plaintiff was "malingering"[1] during an IQ examination that otherwise would have placed her in the category of "mildly mentally retarded" under Social Security regulations.[2]

---

[1] Malingering refers to "the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury, done for the purpose of a consciously desired end." *Dorland's* 1099.

[2] Secondarily, plaintiff also argues that she is disabled under Medical-Vocational Rule 201.10 and the non-exertional limitations exception to Medical-Vocational Rule 201.19. The Court shall also address those arguments.

Less than one year after her first claim was denied, Plaintiff again filed for benefits. Her claim was heard by the same ALJ who, once again, denied the claim. Relying principally on his previous decision, the ALJ specifically noted that no new evidence of mental retardation had yet been provided. Only after the ALJ issued his second decision denying benefits, Plaintiff obtained new medical evidence in the form of an opinion offered by Dr. Michael Fray ("Dr. Fray"), concluding that Plaintiff has an IQ in the category of "mildly mentally retarded," as that term is defined by the Act. The new medical opinion also disputes the notion that any such results are due to "malingering." If the ALJ finds this new evidence credible — a finding properly within his role as factfinder — Plaintiff could be entitled to benefits as a matter of law under listed impairment 12.05C, 20 C.F.R. 404 Appendix 1. However, the ALJ has not had the opportunity to review this evidence.

Plaintiff now challenges the ALJ's decision in this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g), and relying principally on the new evidence. The parties have submitted cross-motions for summary judgment which are now ripe for review.[3] Having reviewed the parties submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, in part, and DENIED, in part; that Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED; and that the final decision of the Commissioner be REMANDED for consideration of the new evidence of Plaintiff's IQ and adaptive limitations.

---

[3] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

As the Court shall explain, remand is necessary to ensure that the ALJ fairly considers the new

evidence and develops a complete record — albeit on a limited issue within a limited period.

## I. MEDICAL HISTORY

To understand the narrow import of the new evidence, one must first understand the

chronology of Plaintiff's medical history in relation to the administrative proceedings.  The

sequence of events is particularly significant in this case for three reasons.  First, certain

evidence on which Plaintiff now relies was created *after* her date last insured ("DLI"). [4]

(*Compare* R. at 185 *with* Pl.'s Mem. Sup. Mot. Sum. J. ("Pl.'s Mem.") at 7; Def.'s Mem. Sup.

Mot. Sum. J. ("Def.'s Mem.") at 7-8.)  Thus, there may be some question as to its relevance to

Plaintiff's medical condition during the relevant period.  Second, the new evidence was

generated after the ALJ issued the decision now under review, so Plaintiff must establish good

cause for the ALJ to now consider it.  Finally, in rendering his decision, the ALJ relied in large

part on his findings from a prior decision rejecting another claim for benefits submitted by

Plaintiff.  That decision is *res judicata* and the findings therein are considered evidence for the

ALJ to consider in subsequent claims for benefits in accordance with *Albright v. Comm'r Soc.

Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999). [5]  However, a critical portion of the record of the prior,

---

[4] To qualify for SSD benefits, a claimant must be both disabled and insured.  42 U.S.C. §
423(a)(1)(A)-(C).  The parties agree that Plaintiff's DLI is June 30, 2008, thus requiring her to
demonstrate that her disability, if any, began on or before that date.  (R. at 185.)  Accordingly,
the focus of the disability onset is restricted to the narrow period from alleged onset (November
25, 2006) to the DLI (June 30, 2008).

[5] Medical evidence in this case may be further narrowed because certain findings by the
ALJ are not relevant to Plaintiff's arguments now before this Court.  Specifically, the ALJ found
that Plaintiff suffered from the severe impairments of lumbar disc herniation at L3-4, spondylosis
and facet arthrosis with radiculopathy, bronchial asthma, chronic obstructive pulmonary disease,
and depression.  Those conditions are not in dispute and the evidence of such conditions will be
discussed no further.  In addition to these impairments, Plaintiff also initially claimed the severe
impairments of osteoporosis, osteoarthritis, sleep apnea, hypertension, GERD-PUD, obesity, and

November 2006 decision is missing from the record now before the Court, rendering it difficult to determine whether substantial evidence would support his conclusion in light of the new evidence.

In his previous, 2006 decision, the ALJ placed great weight on the opinion of Dr. June Wright-Good ("Dr. Wright-Good"). On November 19, 2004, Dr. Wright-Good conducted a consultative examination of Plaintiff including a WAIS-III[6] adult intelligence test. (R. at 74.) The test yielded a verbal IQ of 65 and a performance IQ of 60, but Dr. Wright-Good opined that Plaintiff's score was actually as much as 18 points higher due to "suspected malingering." Although the November 2004 report is not contained in the record now before the Court,[7] Plaintiff concedes the contents of those records, acknowledging that Dr. Wright-Good opined that she was "malingering." (Pl.'s Mem. at 7.) Based on those intelligence test results, the ALJ denied the previous application for benefits on November 24, 2006, finding that Plaintiff's IQ was borderline at worst. (R. at 74.) That decision is final and not presently the subject of this Court's review. (R. at 25.)

In March 2008, Dr. Banerje Koduru ("Dr. Koduru") conducted a psychological examination of Plaintiff. (R. at 488-92.) Although his records are somewhat unclear, he noted that Plaintiff's IQ was "average." (R. at 490.) He made no other findings with regard to Plaintiff's intelligence, focusing his evaluation instead on Plaintiff's severe depression. (R. at

---

cognitive disorder with mild mental retardation. Of these conditions, only Plaintiff's alleged cognitive disorder with mild mental retardation has been raised on appeal.

[6] "WAIS" refers to the "Wechsler Adult Intelligence Scale," which is a group of tests used by mental health professionals to assess an adult's intellectual functioning, including the assignment of an "IQ." *Dorland's Illustrated Medical Dictionary,* 1672, 2074 (32nd ed. 2012) [hereinafter *Dorland's*].

[7] As the Court shall explain in greater detail, *infra* at Section VI(A)(1)(a), the absence from the record of Dr. Wright-Good's report renders a "sentence six" remand particularly appropriate.

28, 488-92.)  Indeed, there is no evidence that Dr. Koduru ever tested Plaintiff's IQ.  The ALJ accepted Dr. Koduru's findings, including his conclusion that Plaintiff's depression is "severe." (R. at 28.)

On September 3, 2009,[8] Dr. Fray evaluated Plaintiff's cognitive functioning using the WAIS-III adult intelligence test, finding a verbal IQ of 75, performance IQ of 69, and full scale IQ of 70.  (R. at 553.)  Also, Dr. Fray examined Dr. Wright-Good's 2004 test results and determined that they were generally consistent with his findings.  (R. at 554.)  He concluded that Plaintiff was not malingering, but was generally cooperative such that the test results are valid. (R. at 554.)  Ultimately, Dr. Fray concluded that Plaintiff "is at the very lower end of the Borderline range."  (R. at 553.)  Overall, he found that "her scores would suggest that she probably is not a very good reader and has a very limited vocabulary and fund of general knowledge."  (R. at 553.)  At the same time, Dr. Fray concluded that "[w]hile she has shown some limited cognitive abilities, it did not appear to [him] that she is in need of someone to assist her in the management of her financial affairs."  (R. at 554.)

Although not part of the official record, Plaintiff has also submitted new evidence in the form of a report by Peter Battista, Psy.D. ("Dr. Battista").  (Pl.'s Mem. Ex. 1, ECF No. 13-1.)  In that report, Dr. Battista opines that Plaintiff's Global Assessment of Functioning ("GAF") is 42 — six points lower than the record otherwise indicates.  (*Compare Id. with* R. at 74.)  He gave Plaintiff a "poor prognosis," finding that she "will likely have difficulty maintaining regular attendance at work" and will be limited to "simple and repetitive tasks."  (Pl.'s Mem. Ex. 1.)

---

[8] The date of September 3, 2009 is somewhat problematic for Plaintiff's argument because it is *after* the ALJ's decision now under review and *after* her date last insured. However, as the Court shall explain, *infra* at Section VI(A)(1), it is nevertheless proper for the Court to remand the case to the ALJ for consideration of the belatedly generated evidence.

## II. ADMINISTRATIVE FINDINGS

On April 9, 2009, the ALJ rendered the decision now under review by this Court. (R. at 25-37.) Important here, the ALJ considered Plaintiff's arguments that she suffered from mild mental retardation, but relied on his November 2006 decision to conclude that she did not meet the criteria for such a finding. He specifically noted that the Plaintiff had not undergone any additional IQ testing since the previous decision. (R. at 31.) Moreover, the ALJ emphasized the interim findings of Dr. Koduru, who had concluded in March 2008 that Plaintiff demonstrated an average IQ, but did not apparently conduct any IQ testing. (R. at 31.)

Plaintiff's current application for benefits — now under review by this Court — alleges disability onset on November 25, 2006 to include only the period since the ALJ's prior decision. (Pl.'s Mem. at 2.) Also, Plaintiff's window to establish her onset of disability is necessarily limited to the period from November 25, 2006 to June 30, 2008 — her date last insured. (Pl.'s Mem. at 6.) Medical evidence generated outside of this period must be viewed with caution. The Court should only consider such evidence to the extent that it might support a finding of onset *during the relevant period.* Moreover, the ALJ's decision now under review was made on April 9, 2009, so medical evidence obtained since that date must also be viewed in temporal context.

## III. PROCEDURAL HISTORY

Plaintiff protectively filed her current application for DIB on June 5, 2007, claiming disability due to a combination of asthma; osteoporosis[9]; osteoarthritis[10]; chronic pain in the

---

[9] Osteoporosis is the "reduction in bone mineral density, leading to fractures after minimal trauma." *Dorland's* 1348.

[10] Osteoarthritis is "a noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's* 1344.

lower back, left shoulder, neck, right hip, and left knee; severe depression with anxiety/panic

disorder; cognitive disorder with mild mental retardation[11]; sleep apnea[12]; hypertension[13];

GERD-PUD[14]; and, obesity. (R. at 123-25, 549-51.)   The Social Security Administration

("SSA") denied Plaintiff's claims initially and on reconsideration.[15]  (R. at 85-87, 92-94.)   On

January 28, 2009, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 39-68.)   On

April 9, 2009, the ALJ denied Plaintiff's application, finding that she was not disabled under the

Act, because, based on her age, education, work experience and residual functional capacity,

there are jobs she could perform which exist in significant numbers in the national economy. (R.

at 36-37.)   The Appeals Council subsequently denied Plaintiff's request for review, making the

---

[11] Mild mental retardation is a degree of "intellectual impairment" characterized by an IQ score between 50 and 70. *Diagnostic and Statistical Manual of Mental Disorders*, 42 (4th ed. text revision 2000) [hereinafter *DSM-IV-TR*].  "As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age." *Id.* at 43. "During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress." *Id.*

[12] Sleep apnea is a temporary "cessation of breathing" during sleep. *Dorland's* 116.

[13] Hypertension is "high arterial blood pressure," often characterized by levels ranging from "140 mm Hg systolic and 90 mm Hg diastolic to as high as 200 mm Hg systolic and 110 mm Hg diastolic." *Dorland's* 896.

[14] GERD-PUD is a two-part condition.  "GERD" refers to "gastroesophageal reflux disease," which is "any condition noted clinically or histopathologically that results from gastroesophageal reflux, ranging in seriousness from mild to life-threatening; principal characteristics are heartburn and regurgitation." *Dorland's* 533, 772.  "PUD" refers to "peptic ulcer disease," which is characterized by "a sore in the inner lining of the stomach or upper small intestine." *Peptic Ulcer Disease – Topic Overview*, WebMD.com, http://www.webmd.com/hw-popup/peptic-ulcers (last visited Feb. 28, 2012).

[15] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## IV. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

## V. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*,

667 F.3d at 476 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[16] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

---

[16] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[17] based on an assessment of the claimant's residual functional capacity ("RFC")[18] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at

---

[17] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[18] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

146, n.5 (1987)).  The Commissioner can carry his burden in the final step with the testimony of

a vocational expert ("VE").  When a VE is called to testify, the ALJ's function is to pose

hypothetical questions that accurately represent the claimant's RFC based on all evidence on

record and a fair description of all of the claimant's impairments, so that the VE can offer

testimony about any jobs existing in the national economy that the claimant can perform.  *Walker*

*v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents *all* of

the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."

*Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be

disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## VI.  ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset

of her disability.  (R. at 28.)  At steps two and three, the ALJ found that Plaintiff had the severe

impairments of Lumbar disc herniation at L3-4, spondylosis and facet arthrosis with

radiculopathy, bronchial asthma, chronic obstructive pulmonary disease, and depression, but that

these impairments did not meet or equal any listing in 20 C.F.R. pt. 404, subpt. P, app. 1, as

required for the award of benefits at that stage.  (R. at 28-31.)  The ALJ next determined that

Plaintiff had the RFC to perform sedentary work except that she may alternate between sitting

and standing or walking; due to her dizziness, she may not perform jobs involving heights, steps

or moving machinery; due to her respiratory problems, she may not perform jobs with

temperature extremes or environmental irritants; due to her back pain, she may not bend, push, or

pull, she may not perform jobs that entail reaching overhead with her left non-dominant upper

extremity; and, due to a combination of her medication side effects and pain, she is limited to

understanding, remembering, and carrying out short, simple instructions and performing routine tasks. (R. at 31.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform her past relevant work as a cashier, grounds keeper, industrial cleaner, and grocery stock clerk, because of the levels of exertion required in each position. (R. at 35.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could perform. (R. at 36-37.) Specifically, the ALJ found that Plaintiff, regardless of her limitations, could work as a beverage order clerk, a systems monitor, and a newspaper cutter/paster. (R. at 36.) Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that she was not entitled to benefits. (R. at 37.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J. at 1.) In support of her position, Plaintiff argues that: (1) she is disabled by a combination of impairments which are equal to or functionally equivalent in severity to Listed Impairment 12.05C; (2) she is disabled under the non-exertional limitations exception to Medical-Vocational Rule 201.19; and, (3) she is disabled under Medical-Vocational Rule 201.10 as of July 31, 2009. (Pl.'s Mot. at 11-18.) Plaintiff's argument based on Listed Impairment 12.05C is particularly significant because, if accepted by the ALJ, it would have ended the analysis with an award of benefits at Step 3. Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mem. at 9-16.)

## A.    Listed Impairment 12.05C

Plaintiff argues that she qualifies for disability as a matter of law at Step 3 of the

sequential analysis, because she is "mentally retarded" as defined at Listed Impairment 12.05C.

This provision defines mental retardation as follows:

> Mental retardation: Mental retardation refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning initially manifested
> during the developmental period; *i.e.*, the evidence demonstrates or supports onset
> of the impairment before age 22. . . . [which may be established by] A valid
> verbal, performance, or full scale IQ of 60 through 70 and a physical or other
> mental impairment imposing an additional and significant work-related limitation
> of functioning.

20 C.F.R. pt. 404, subpt. P, app. 1.  Based on this definition, Plaintiff qualifies for benefits under

Listed Impairment 12.05C if she meets a three part test: (1) she establishes a valid IQ score of

between 60 and 70; (2) she possesses at least one other physical or mental severe limitation; and,

(3) she satisfies the so-called "capsule definition" of mental retardation such that she also

possesses the requisite "deficits in adaptive functioning." *Turnage v. Astrue*, No. 11-4071-JAR,

2012 U.S. Dist. LEXIS 15455, at *19 (D. Kansas Feb. 8, 2012); *Justice v. Barnhart*, 431 F.

Supp. 2d 617, 619 (W.D. Va. 2006) ("the Fourth Circuit has not held that low IQ alone proves

manifestation of deficits in adaptive functioning before age 22").

Because the ALJ found that Plaintiff possessed several severe physical limitations and

also found that she suffered from severe depression, she meets the second part of this test.  In

large part, her qualification under Listed Impairment 12.05C turns on whether she has a "valid

verbal, performance, or full scale IQ of 60 through 70" such that she demonstrates such

limitations before her 22nd birthday, which would satisfy the first requirement.  20 C.F.R. pt.

404, subpt. P, app. 1.  She must also satisfy the "adaptive functioning" requirement.

Relying principally on the September 2009 evaluation by Dr. Fray, Plaintiff argues that she satisfies the IQ requirements of Listed Impairment 12.05C. Specifically, she argues that his IQ test results yielded scores of 75, 69, and 70, placing her IQ in the required range to qualify under Listed Impairment 12.05C.[19]  As a preliminary matter, the Court notes that this evidence was *not* presented to the ALJ, who made his decision approximately five months before Dr. Fray's evaluation of Plaintiff.  "Assessing the probative value of competing evidence is quintessentially the role of the fact finder" — the ALJ. *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. Dec. 2, 2011).  Nevertheless, Plaintiff must make a showing that such new evidence meets the standard for a "sentence 6" remand under *Borders v. Heckler*, 777 F.2d 954 (4th Cir. 1985).

In general, a district court cannot consider evidence which was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citations omitted).  Although the Court cannot consider evidence which was not presented to the ALJ, the Act provides that the Court *may* remand a case for reconsideration in two situations.  42 U.S.C. § 405(g) (emphasis added). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing."  *Id.*  Here, a "sentence four" remand is inappropriate because Plaintiff requests relief based on new evidence and sentence four remands must be based solely on the existing record. *Siler v. Astrue*, 7:08cv197, 2009 U.S. Dist. LEXIS 56443, at *36 (W.D. Va. June 19, 2009).  The record does not contain Dr. Wright-Good's 2004 IQ test results and it remains the role of the

---

[19] When multiple categories of IQ scores are examined, the lowest score controls the analysis for purposes of listed impairment 12.05C. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00D.6.a; *see also Turnage*, 2012 U.S. Dist. LEXIS 15455, at *14.

ALJ to weigh those results against any newly discovered evidence. *See Hancock*, 667 F.3d at 472.

Instead, a "sentence six" remand appears to be appropriate. Such a remand provides that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Such a remand is within the sound discretion of the district court. *Doctors Nursing & Rehab. Ctr. v. Sebelius*, 613 F.3d 672, 680 (7th Cir. 2010) (citing *Dudley v. Astrue*, 246 Fed. App'x 249, 251 (5th Cir. 2007)).

In *Borders*, the Fourth Circuit held that a reviewing court may issue a "sentence 6" remand if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. 777 F.2d at 955. The Court concludes that Dr. Fray's September 2009 report satisfies these requirements.

### a. Dr. Fray's Report is Relevant and not Merely Cumulative

As new evidence, Dr. Fray's 2009 test results meet the first requirement because they are not merely cumulative. As Defendant properly notes, the record contains the opinions of several mental health experts, none of whom found any significant cognitive impairment. (R. at 216-23, 473-85, 490, 529, 533; Def.'s Mem. at 14-15.) Indeed, Dr. Koduru specifically noted that Plaintiff had an "average" IQ. (R. at 490.) But Dr. Koduru's report does not contain any objective medical evidence to support his conclusion, such as a WAIS-III adult intelligence

15

examination. (*See* R. at 490.)  Without explanation, Dr. Koduru's conclusory notation is nothing more than a subjective, passing reference.  And because he was not specifically examining Plaintiff's IQ, it would not be proper for an ALJ to rely on such a notation in the face of contradictory evidence — such as the new evidence from Dr. Fray.  It is particularly inappropriate for an ALJ "to draw a negative inference from the report of a physician who was neither treating nor examining the claimant for his [cognitive] limitations." *Turnage*, 2012 U.S. Dist. LEXIS 15455, at *26 (citation and internal quotation marks omitted).  While Dr. Koduru was examining Plaintiff's psychological condition generally, there is no indication that he specifically examined her cognitive impairments in any depth.

The only objective IQ test *mentioned* in the record is Dr. Wright-Good's 2004 WAIS-III examination of Plaintiff, in which she found the results to be unreliable due to "malingering." (R. at 74; Pl.'s Mem. at 7.)  Significantly, Dr. Wright-Good's report is not contained in the record now before the Court.  Instead, the ALJ considered his prior decision as "probative" evidence of Plaintiff's IQ simply because that decision relied upon Dr. Wright-Good's report. The ALJ was permitted to do so according to *Albright*, 174 F.3d at 477-78.  However, had contrary evidence existed at that time, such as the now-available report of Dr. Fray, the ALJ would have been also required to weigh the varying reports and resolve the discrepancy.  He could not engage in such an exercise without Dr. Fray's report, because no discrepancy otherwise exists in the record.  Importantly, the ALJ noted the absence of any new IQ tests as a basis for placing great weight on his November 2006 decision.  (R. at 31.)  Alone, this suggests that the new evidence is relevant and material.

When a reviewing court "cannot determine, from review of the record as a whole, if substantial evidence supports the denial of benefits, [it] must reverse and remand for further

proceedings." *Meyer*, 662 F.3d at 701. In the face of the competing opinions of Drs. Fray and Wright-Good — one which is in the record and one which is not — the Court cannot determine whether the ALJ would have been able to credit one over the other. This presents a unique juxtaposition between the two reports: this Court has Dr. Fray's report, but the ALJ did not; the ALJ had Dr. Wright-Good's report, but this Court does not. Such a "gap" in the record is problematic when addressing a claimant's cognitive functioning, because Social Security regulations specifically require such experts to comment on the validity of IQ scores. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00D.6.a; *see also Turnage*, 2012 U.S. Dist. LEXIS 15455, at *15. Without the benefit of Dr. Wright-Good's specific comments, the Court cannot assess whether substantial evidence would support a decision to credit her opinion over that of Dr. Fray. Accordingly, remand is appropriate to mend this gap in the record and permit the ALJ to fulfill his role as factfinder — a function for which this Court is ill-equipped.

In other words, all evidence previously presented to the ALJ tended to show that Plaintiff's IQ exceeded 70, so there was no basis to disturb his prior ruling. Now, Plaintiff has medical evidence that her IQ is, in fact, between 60 and 70 — potentially supporting a finding that she is mildly mentally retarded according to listed impairment 12.05C. Rather than being cumulative, the new evidence creates a conflict in the medical record which did not exist when the ALJ made the decision now under review. And, it is relevant to the issue of Plaintiff's cognitive impairment, if any. Thus, Dr. Fray's 2009 report satisfies the first requirement for a "sentence 6" remand.

b.     **Dr. Fray's Report is Material**

For similar reasons, the report also meets the requirements that the new evidence be material. New evidence must relate to the determination of disability *at the time the application*

17

*was first filed*, and it must not concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3rd Cir. 1984) (emphasis added) (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982); *see also Borders*, 777 F.2d at 955. Evidence must also be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Id.* at 955-56 (citation and internal quotation marks omitted).

The first part of materiality involves the timing of the evidence. Here, Defendant correctly identifies two deficiencies with Dr. Fray's report. First, the report was generated *after* Plaintiff's date last insured. Second, the IQ test results reflect Plaintiff's IQ nearly three decades after her 22nd birthday — the age at which she must establish a qualifying IQ under Listed Impairment 12.05C. Neither chronological deficiency is dispositive, because the Fourth Circuit explicitly recognizes that IQ scores obtained later in life may reflect intelligence at age 22. *Luckey v. U.S. Dep't of Health & Human Svcs.*, 890 F.2d 666, 668 (4th Cir. 1989) ("[I]n the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant").

Of course, in *Luckey*, the Fourth Circuit established such a rule only where there exists an "absence of evidence of a change in a claimant's intelligence functioning," such as a previous IQ score. *Id.* Here, there exists at least some evidence of a higher IQ score, because Dr. Wright-Good's assessment places Plaintiff's IQ in the 70 to 80 range. (R. at 74; Pl.'s Mem. at 7.) In light of such conflicting evidence, the assumption "that the claimant's IQ had remained relatively constant" would not be obligatory. *Luckey*, 890 F.2d at 668. At the same time, this does not necessarily mean that the opposite is true — that the ALJ would be prohibited from making such

18

an assumption based on Dr. Fray's report. But Dr. Wright-Good's opinion that Plaintiff was "malingering" conflicts with that of Dr. Fray. It is the ALJ's role to weigh the two opinions and resolve the conflict. *Meyer*, 662 F.3d at 707. Depending on how the ALJ resolves such a conflict, the rationale forming the basis of the *Luckey* decision may yet apply. That is, if the ALJ were to place greater weight on Dr. Fray's opinion than that of Dr. Wright-Good, he *could* find that Dr. Fray's results constitute evidence of Plaintiff's sub-average IQ as early as age 22.

Similarly, the fact that Dr. Fray's assessment was conducted *after* Plaintiff's date last insured does not necessarily preclude a finding that her IQ was within the necessary range *before* her date last insured. If the ALJ could find that her IQ was the same at age 22 as Dr. Fray now opines that it is, the ALJ would also logically conclude that Dr. Fray's test results reflect Plaintiff's intelligence before the date last insured, which was barely more than a year before his assessment.

Here, Dr. Fray's report is "material" in the sense that it *could* have changed the ALJ's decision. To satisfy Listed Impairment 12.05C, Plaintiff is required to prove that she possessed an IQ of between 60 and 70 as of her 22nd birthday. If found credible, Dr. Fray's report would satisfy this requirement, thus permitting (but not requiring) the ALJ to find for Plaintiff. Accordingly, the materiality requirement of a "sentence 6" remand is satisfied.

The same cannot necessarily be said about Dr. Battista's report. In conclusory fashion, Plaintiff argues that Dr. Battista's report should have been considered despite the fact that it was generated *after* Plaintiff's date last insured. Unlike IQ scores, which may be assumed constant through a person's life, *see Luckey*, 890 F.2d at 668, there is no authority to indicate that a GAF score rendered at one point in a person's life necessarily reflects a GAF score during a prior period. Accordingly, the Court cannot conclude that Dr. Battista's report is "material" by itself.

And so, if the only new evidence was Dr. Battista's report, the Court would not be inclined to recommend remand. But, because the Court recommends remand to consider Dr. Fray's report, the Court also recommends that the ALJ consider whether Dr. Battista's report is entitled to any weight so that the record may be more fully developed.

### c.    Good Cause and the Nature of the New Evidence

Finally, Plaintiff easily meets the third and fourth requirements of the *Borders* standard. 777 F.2d at 955. There is good cause for Plaintiff's failure to submit the evidence earlier simply because the report was completed only after the ALJ's decision — thus, there was no way that this evidence could have been considered. Any counterargument that Plaintiff should have proffered such evidence sooner is also unavailing because, as Plaintiff has explained, she timely requested that the ALJ permit the very consultative examination that yielded Dr. Fray's findings. (R. at 551.) Any neglect is therefore excusable. Also, Plaintiff has made a general showing of the nature of the new evidence, as the evidence has been made a part of the record on appeal. (R. at 552-54.)

Having met all four requirements, the Court recommends that the discretionary "sentence six" remand be granted so that the ALJ may weigh the reports of Drs. Fray and Battista. At the same time, the Court takes no position on whether either opinion dictates any particular result in this case. The new evidence merely creates a conflict within the medical record and it is properly the role of the ALJ to resolve such a dispute by weighing the medical evidence. *See Hancock*, 667 F.3d at 474-75. "'[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior.'" *Id.* (quoting *Lowery v. Sullivan*, 979 F.2d 835, 837

(11th Cir. 1992)). It is merely incumbent upon the ALJ — not this Court — to serve as factfinder to resolve the conflict created by Dr. Fray's report. *See id.*

### 2. Adaptive Functioning – the "Capsule Definition"

There also remains the question whether Plaintiff suffered from a deficit in adaptive functioning during the relevant period — the so-called "capsule definition" of mental retardation. *Turnage*, 2012 U.S. Dist. LEXIS 15455, at *19; *Justice*, 431 F. Supp. 2d at 619. If credited, Dr. Fray's report could constitute substantial evidence in support of such a finding. Again, this requires the weighing of conflicting medical evidence — a role properly left to the ALJ. *See Hancock*, 667 F.3d at 472. The Court notes that "the Fourth Circuit has not held that low IQ *alone* proves manifestation of deficits in adaptive functioning before age 22." *Justice*, 431 F. Supp. 2d at 619 (emphasis added) (citing *Luckey*, 890 F.2d at 668). Rather, as a separate analysis, the ALJ must also determine whether there existed a "manifestation of deficits in adaptive functioning before age 22." *Id.* If credited, both Dr. Fray's report and Dr. Battista's report could impact that analysis to a degree.

### B. Non-Exertional Limitations Exception to Medical-Vocational Rule #201.19

As an alternative basis for relief, Plaintiff argues that the ALJ should have granted benefits pursuant to the non-exertional limitations exception to Medical-Vocational Rule #201.19. (Pl.'s Mem. at 16-17.) Defendant makes no mention of this argument in its brief. In arguing for benefits pursuant to this argument, Plaintiff once again points to her asserted cognitive impairments based in part on the new evidence discussed, *supra* at Section VI(A).

Based on the Court's recommendation that the matter be remanded for consideration of new evidence, the Court makes no finding with regard to the applicability of the non-exertional limitations exception to Medical-Vocational Rule #201.19. Instead, should the ALJ find the new

evidence credible, he should then consider whether it impacts his analysis pursuant to the non-exertional limitations exception to Medical-Vocational Rule #201.19.

**C.    Disability Under Medical-Vocational Rule 201.10 as of July 31, 2009**

Plaintiff argues that she is disabled as of July 31, 2009 — her fiftieth birthday — because her age then qualified her for benefits pursuant to Medical-Vocational Rule #201.10. Such an argument cannot be reconciled with her date last insured of June 30, 2008. (Pl.'s Mem. at 6.) Plaintiff fails to explain this discrepancy, and so the Court cannot recommend remand on such a basis.

## VII. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, in part, and DENIED, in part; that Defendant's motion for summary judgment (ECF No. 14) be DENIED; and, that the final decision of the Commissioner be REMANDED for consideration of new evidence.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

 

                                               /s/

                                              David J. Novak
                                              United States Magistrate Judge

Richmond, Virginia
Date: March 28, 2012